# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MICHAEL BROWN, Derivatively on Behalf of LUMEN TECHNOLOGIES, INC.<br><br>       Plaintiff,<br><br> v.<br><br>KATE JOHNSON, QUINCY L. ALLEN, MARTHA H. BEJAR, VIRGINIA BOULET, PETER C. BROWN, KEVIN P. CHILTON, STEVEN T. "TERRY" CLONTZ, INDRANEEL DEV, JIM FOWLER, T. MICHAEL GLENN, W. BRUCE HANKS, HAL STANLEY JONES, MARY L. LANDRIEU, DIANKHA LINEAR, ERIC J. MORTENSEN, HARVEY P. PERRY, GLEN F. POST III, MICHAEL J. ROBERTS, LAURIE SIEGEL, CHRIS STANSBURY AND JEFFREY K. STOREY,<br><br>       Defendants,<br><br>And<br><br>LUMEN TECHNOLOGIES, INC.<br><br>      Nominal Defendant. | **Case No.: 3:24-cv-00798**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## VERIFIED DERIVATIVE COMPLAINT

Plaintiff Michael Brown ("Plaintiff"), by and through his undersigned counsel, respectfully submits this Verified Shareholder Derivative Complaint on behalf of Nominal Defendant Lumen Technologies, Inc. ("Lumen" or the "Company") against certain current and/or former members (the "Individual Defendants") of its Board of Directors (the "Board") and executive officers seeking to remedy Individual Defendants' breaches of fiduciary duties. Plaintiff bases his allegations on personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's counsel.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Nominal Defendant Lumen against certain of its officers and directors for breaches of fiduciary duties and other violations of law. These wrongs resulted in hundreds of millions of dollars in damages to Lumen's goodwill and business reputation.

2.      Lumen is a Louisiana corporation with its principal place of business in Monroe, Louisiana. Lumen purports to be a "technology and communications company" which provides local and long-distance voice, broadband, Multi-Protocol Label Switching, private line (including special access), Ethernet, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol (VoIP), information technology, and other ancillary services. The Company's offerings include various integrated products and services to businesses and residential customers in the U.S. and internationally. Lumen operates, *inter alia*, a copper cable network for certain of its telecommunications services. The Company was formerly

known as "CenturyLink, Inc." and changed its name to "Lumen Technologies, Inc." in September 2020.

3.    Lumen is a member of the USTelecom, a broadband association that represents companies in the telecommunications industry. Lumen is also one of the telecommunication companies that inherited the Bell Telephone Company's (a/k/a "Ma Bell" or the "Bell System") telecom cables in the decades following the breakup of the Bell System's telecommunications monopoly in 1984.

4.    In its SEC filings as well as other disclosures, Lumen repeatedly touted its miles of "copper" cable network and its commitment to environmental, social and governance ("ESG"). For example, in its ESG reports, Lumen states "Lumen is committed to strong corporate governance principles, growing our business in a sustainable and socially responsible manner and making a positive difference in the world and specifically in the communities we serve." Under the section for environment, Lumen doubles down on its promises and touts, "We are focused on complying with applicable environmental regulatory requirements. Our environmental management systems (EMS) help us identify and mitigate the environmental impacts of our operations, drive continuous improvement and facilitate regulatory compliance." Lumen further states that it is "committed to providing a healthy and safe workplace for our employees and others who visit our facilities." During all relevant times, Lumen has touted its commitment to the environment and workplace safety.

5.    Unbeknownst to investors, Lumen has been operating at least 35,000 miles of cable networks consisting of lead encased wires that are toxic to the environment. These old lead-sheathed wires are buried underground or hung above ground and, with passage of time, have deteriorated, causing water, soil and air pollution by the release of toxins into the environment.

Lumen concealed the use of such lead casings and the ensuing seepage of lead toxins, which present a grave danger to Lumen's workers as well as surrounding communities and the public at large. While Lumen was aware of this fact, it continued to mislead investors by touting its commitment to the environment and safety and purporting to adhere to highest ESG standards in its various disclosures.

6.      The market learned of these undisclosed facts via a series of scandalous *Wall Street Journal* ("*WSJ*") articles, which revealed that telecom companies, including Lumen, have been operating decades-old lead sheathed cables, which have eroded over time, causing lead to seep into water and soil, causing contamination of soil and groundwater and posing a significant health and environmental hazard. *WSJ* subsequently published articles on July 11, 12, and 14, 2023, further detailing the use of lead sheathing for copper wires by telecom companies, including Lumen. The *WSJ* articles detailed the impact of lead exposure on health, including experiences of workers who had been exposed to lead over a period of time. The *WSJ* articles also described the significant efforts and costs (in billions of dollars) it would require to remediate, locate and remove the lead-encased cables.

7.      When investors learned through a series of *WSJ* articles of Lumen's wide-spread use of lead cables, its dangerous impact on human health and the environment, and Lumen's contribution and, thus, potential liability for the grave problem, Lumen common stock plummeted significantly with the release of each of the *WSJ* articles. For example, after the date of the publication of the first *WSJ* article on July 9, 2023, Lumen's stock price fell nearly 6%, to close at $2.06 per share on July 10, 2023. On July 11, 2023, the *WSJ* published another article, which caused Lumen's stock price to fall $0.03 per share, or 1.45%, to close at $2.04 per share on July 12, 2023.

8.      Industry observers and analysts reacted negatively to the previously undisclosed news. For example, on July 14, 2023, *Seeking Alpha* reported that a J.P. Morgan analyst had concluded that "Lumen . . . likely . . . ha[s] 'exposure' to potential copper [cable] lead sheathing liability." On this news, Lumen's stock price fell $0.21 per share, or 10.19%, to close at $1.85 per share on July 14, 2023. After the market closed, Lumen's stock price further slid by $0.15 per share, or 8.11%, to close at $1.70 per share the next trading day on July 17, 2023.

9.      The widely publicized news of Lumen's and other telecom companies' operation of highly toxic lead cables caught the attention of various state and federal regulatory bodies. For example, on July 11, 2023, the EPA made a statement announcing that "[p]rotecting Americans from lead exposure … is a key focus of the agency's mission to protect public health." Similarly, on July 12, 2023, Senator Edward Markey from Massachusetts, Chair of the Senate Environment and Public Works Subcommittee on Clean Air, Climate, and Nuclear Safety, issued a letter to the USTelecom demanding answers to the investigation by *WSJ*. Senator Markey called for telecommunication companies responsible for the cables to "act swiftly and responsibly to ensure the mitigation of any environmental and public health effects." Among other things, Senator Markey demanded that telecom companies answer questions relating to location and mileage of lead-sheathed cables, companies' prior knowledge and potential exposure risks and remediation plans by July 25, 2023.

10.      On July 20, 2023, Congressman Pat Ryan also wrote to the CEOs of various telecom companies as well as the USTelecom demanding that they remove toxic lead cables. Congressman Ryan expressed his concern over the lead-sheathed copper wiring across America and called out the telecom companies, denouncing the hidden lead cables as the "latest failure" by telecom companies. Congressman Ryan also demanded answers to the same questions posed by

Sen. Markey. Other regulatory bodies such as the New York State Department of Health and the Department of Environmental Conservation made public statements committing to work with local health departments to conduct testing, while the Federal Communications Commission ("FCC") stated that they are "ready to assist addressing these public health concerns."

11.     On August 1, 2023, on Lumen's quarterly earnings call, Defendant Stansbury revealed, for the first time, that "5% of [Lumen's] 700,000-mile copper network contain[s] lead," which translates into roughly 35,000 miles of cables containing lead.

12.     Lumen had been on notice of the extent of the lead sheathing and its impact on its workers since many years before the *WSJ* articles were published. For example, in 2013, following manhole work with lead-encased cable, a technician experienced medical problems that were determined to have resulted from lead exposure. This event led to a five-month-long investigation by the Minnesota Occupational Safety and Health Administration ("OSHA"). As a result, the Minnesota OSHA issued nine citations for serious violations of the OSHA Lead Standard. In November 2013, Lumen and the Minnesota OSHA entered into a settlement wherein Lumen agreed to a lead abatement program. This program included "Lead Sheath Cable Cleaning, Preparation for Spicing and Removal." Other specific provisions of the settlement included notification and training of employees; coverage of safe and healthful work practices and procedures; provision of appropriate engineering, administrative, and personal protective equipment to prevent/control lead exposure, medical surveillance, and personal hygiene.

13.     However, the series of *WSJ* articles published years later revealed that the Board did not do enough to fully remedy the issue of Lumen's use of lead encased cables and did not ensure that Lumen fulfilled the requirements of the lead abatement program imposed by Minnesota OSHA. The continuous inaction by Individual Defendants exposed the Company to regulatory

fines, probes by state and federal regulators, and significant liabilities, as well as large costs in connection with responding to and defending private lawsuits filed against it.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1); Rule 14a-9 of the Exchange Act, 17 C.F.R § 240.14a-9.

15.     This Court has personal jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in Louisiana or is an individual who has sufficient minimum contacts with Louisiana so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants either resides in or maintains executive offices in the Western District of Louisiana, and the nominal Defendant, Lumen, has received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

## PARTIES

17.     Plaintiff is a current shareholder of Lumen and has continuously been a Lumen shareholder at all relevant times. Plaintiff is a citizen of California.

18.     Nominal Defendant Lumen is incorporated in Louisiana with its principal executive offices located at 100 CenturyLink Drive, Monroe, Louisiana 71203. Lumen's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LUMN."

19.     Defendant Quincy L. Allen ("Allen") has served on Lumen's Board of Directors since 2021 and is a member of Lumen's Audit Committee as well as its Human Resources and

Compensation Committee. Upon information and belief, Defendant Allen is a citizen of New York. For the year 2023, Allen's total compensation was $335,672.

20.     Defendant Martha H. Bejar ("Bejar") has served on Lumen's Board of Directors since 2016. She is also a member of Lumen's Human Resources and Compensation Committee and Chair of the Nominating and Corporate Governance Committee. Upon information and belief, Defendant Bejar is a citizen of Washington. For the year 2023, Bejar's total compensation was $348,672.

21.     Defendant Virginia Boulet ("Boulet") began serving as a director for CenturyLink in 1995 and remained on Lumen's Board of Directors until 2021. Upon information and belief, Defendant Boulet is a citizen of Louisiana.

22.     Defendant Peter C. Brown ("Brown") has served on Lumen's Board of Directors since 2006. Defendant Brown is a member of Lumen's Audit Committee and Risk and Security Committee. Upon information and belief Defendant Brown is a citizen of Kansas. For the year 2023, Brown's total compensation was $333,672.

23.     Defendant Kevin P. Chilton ("Chilton") has served on Lumen's Board of Directors since 2017. Defendant Chilton is a member of Lumen's Audit Committee and Chair of its Risk and Security Committee. Upon information and belief Defendant Chilton is a citizen of Colorado. For the year 2023, Defendant Chilton's total compensation was $348,672.

24.     Defendant Steven T. "Terry" Clontz ("Clontz") has served on Lumen's Board of Directors since 2017. Defendant Clontz is a member of Lumen's Human Resources and Compensation Committee as well as its Nominating and Governance Committee. Upon information and belief, Defendant Clontz is a citizen of Florida. For the year 2023, Clontz's total compensation was $348,672.

25.     Defendant Indraneel Dev ("Dev") served as Lumen's EVP and CFO until April 1, 2022. Upon information and belief, Defendant Dev is a citizen of Colorado.

26.     Defendant Jim Fowler ("Fowler") has served on Lumen's Board of Directors since 2023. Defendant Fowler is a member of the Audit Committee and Risk and Security Committee. Upon information and belief, Defendant Fowler is a citizen of Ohio. For the year 2023, Fowler's total compensation was $210,736.

27.     Defendant T. Michael Glenn ("Glenn") has served on Lumen's Board of Directors since 2017. He is also a member of Lumen's Human Resources and Compensation Committee. Upon information and belief, Defendant Glenn is a citizen of Tennessee. For the year 2023, Glenn's total compensation was $518,672.

28.     Defendant W. Bruce Hanks ("Hanks") has served as a director on Lumen's Board since 1992 until his retirement in 2023. Upon information and belief, Defendant Perry is a citizen of Louisiana.

29.     Defendant Hal Stanley Jones ("Jones") has served on Lumen's Board of Directors since 2006. Defendant Jones is the Chair of the Audit Committee and Risk and Security Committee. Upon information and belief, Defendant Jones is a citizen of the District of Columbia.

30.     Defendant Kate Johnson ("Johnson") is Lumen's President, Chief Executive Officer ("CEO"), and a member of the Company's Board of Directors ("Board") since November 7, 2022. Upon information and belief, Defendant Johnson is a citizen of Colorado. For the year 2023, Johnson's total compensation was $9,592,963.

31.     Defendant Mary L. Landrieu ("Landrieu") served as a director on Lumen's Board from November 2015 until May 2020. Upon information and belief, Defendant Landrieu is a citizen of Louisiana.

32.     Defendant Diankha Linear ("Linear") has served on Lumen's Board of Directors since 2024. Defendant Linear is a member of Lumen's Nominating and Governance Committee and Risk and Security Committee. Upon information and belief Defendant Linear is a citizen of Washington.

33.     Defendant Eric J. Mortensen ("Mortensen") is a former senior VP/Controller at Lumen and occupied that position during the relevant period. Defendant Mortensen retired in May 2021. Upon information and belief, Defendant Mortensen is a citizen of Colorado.

34.     Defendant Harvey P. Perry ("Perry") has served as a director on Lumen's Board since 1990 and retired from the Company in May 2020. Upon information and belief, Defendant Perry is a citizen of Louisiana.

35.     Defendant Glen F. Post III ("Post") has served as a director on Lumen's Board since 1990. Defendant Post also served as Chief Executive Officer ("CEO") since 1992. Defendant Post also served as President since 2009 as well as from 1990 to 2002. From 2002 to 2009, Defendant Post served as Chairman of the Board of Directors as well as Vice Chairman of the Board from 1993 to 2002. During his time at Lumen, Defendant Post also served as Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"). Upon information and belief Defendant Post is a citizen of Louisiana. Defendant Post retired in January 2019.

36.     Defendant Michael J. Roberts ("Roberts") began serving as a director for Lumen in 2011. Upon information and belief Defendant Roberts is a citizen of California. Defendant Roberts left the Company in 2023.

37.     Defendant Laurie Siegel ("Siegel") has served on Lumen's Board of Directors since 2009. She is the Chair of Lumen's Human Resources and Compensation Committee and a member

of the Nominating and Corporate Governance Committee. Upon information and belief, Defendant Siegel is a citizen of California. For the year 2023, Siegel's total compensation was $346,797.

38.    Defendant Chris Stansbury ("Stansbury") has served as Lumen's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since April 4, 2022. Upon information and belief, Defendant Johnson is a citizen of Colorado. For the year 2023, Stansbury's total compensation was $4,996,780.

39.    Defendant Jeffrey K. Storey ("Storey") served as the Company's President and COO and had been a director of Lumen since November 2017. On May 23, 2018, Defendant Storey became the Company's CEO. Defendant Storey announced his retirement from Lumen on September 13, 2022 and retired from the Company at the end of 2022. Upon information and belief, Defendant Storey is a citizen of Oklahoma.

40.    Defendants Johnson, Stansbury, Allen, Clontz, Bejar, Brown, Chilton, Glenn, Jones, Linear, Siegel, Fowler, Boulet, Dev, Perry, Hanks, Mortensen, Landrieu, Post, Roberts, Stansbury and Storey are collectively referred to as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

41.    By reason of their positions as officers, directors and/or fiduciaries of Lumen and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Lumen and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Lumen and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

42.     Each director and officer of the Company owes to Lumen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

43.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lumen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Due to their positions with Lumen, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

44.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Lumen were required to, among other things:

   a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b. Exercise good faith to ensure that the Company operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

   c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

45.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Lumen, the absence of good faith on their part and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

46.     The Individual Defendants breached their duties of loyalty, care and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures with respect to monitoring for lead in their cables; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with federal and state laws, including rules and regulations, foreign laws and treaties concerning environmental protection; (iii) failing to cause the Company to make full and fair disclosure concerning (a) the effectiveness of the Company's policies and procedures with respect to environmental pollution, and (b) the scope and impact of widespread use of lead cables in their telecom network, resulting in the filing of class action lawsuits for violation of federal securities law, investigations by the New York State Department of Health, Department of Environment Conservation, and Department of Justice, as well as investigations by multiple senators and state attorney generals, and potential liabilities arising from the investigation by the FCC.

### A.  <u>Additional Duties of the Audit Committee</u>

47.     Lumen maintains an "Audit Committee," the purpose of which is to "manage[] and monitor[] internal controls and financial process" on Lumen's website. The Audit Committee's charter states that the Audit Committee's primary function "is to assist the Board of Directors in fulfilling its oversight responsibilities by (1) overseeing the Company's system of financial reporting, auditing, controls and legal compliance, (2) monitoring the operation of such system and the integrity of the Company's financial statements and related disclosures, (3) monitoring the qualifications, independence and performance of the outside and internal auditors and (4) overseeing the Company's finance functions."

48.     The Audit Committee's charter further notes that its role is to "oversee" the process of "preparing the Company's financial statements, maintaining internal controls, maintaining

disclosure controls and procedures, and preparing the Company's disclosure documents in compliance with applicable law" and "discharging such other functions as are assigned by law, the Company's organizational documents."

49.     Individual Defendants Jones, Allen, Brown, Chilton, and Fowler are members of the Audit Committee.

### B.  Additional Duties of the Nominating and Corporate Governance Committee

50.     Lumen maintains a "Nominating and Corporate Governance Committee," which, among other things, is responsible for "provid[ing] oversight of the Company's environmental, social and corporate governance policies and initiatives, including developing, recommending, and thereafter periodically reviewing the Corporate Governance Guidelines and principles applicable to the Company…"

51.     The Nominating and Corporate Governance Committee is also tasked with "oversee[ing] and monitor[ing], and periodically report[ing] [] on Company's policies, initiatives and disclosures relating to environmental and social matters as they pertain to the Company's business and long-term strategy, including human rights and ethical business practices, environmental and sustainability initiatives, diversity and inclusion and other initiatives related to the Company's operations and engagement with associates, customers, suppliers, and communities."

52.     Individual Defendants Bejar, Clontz, Siegel and Linear are members of the Nominating and Corporate Governance Committee.

## C.  **Additional Duties Imposed by the Company's Code of Conduct**

53.      The Individual Defendants, as officers and/or directors of Lumen, are also bound by the Company's Code of Conduct (the "Code"), which "sets forth the basic principles [everyone] must follow to uphold [the] Company's ethical business culture." Each employee, officer, and director of Lumen is covered by the Code.

54.      Among other things, the Code of Conduct requires Lumen to follow all internal control procedures. Lumen's senior financial officers — including, but not limited to, Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer — have additional responsibilities. "They must ensure that the financial information [Lumen] disclose[s] in public communications and file in the Company periodic reports with the Securities and Exchange Commission ("SEC") is full, fair, accurate, timely and understandable."

55.      In addition to the above, Lumen's Code of Conduct states that the Company's senior financial officers are required to:

     a.  Help maintain reliable internal controls, assess their quality and effectiveness, implement improvements, and report or resolve weaknesses that could materially affect or render financial disclosures or reports inaccurate;

     b.  Inform the Disclosure Committee of transactions, events or circumstances that could have a material impact on Company's financial reports;

     c.  Fairly and accurately represent material facts or circumstances when interacting with our auditors and those individuals who prepare our Company's financial statements.

56.      Upon information and belief, the Company maintained a version of the Code during the relevant period that imposed the same, or substantially and materially the same or similar, duties on the Board, among others, as those set forth above.

### D. **Control, Access, and Authority**

57.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lumen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lumen.

58.     Because of their advisory, executive, managerial, and directorial positions with Lumen, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Lumen.

59.     At all relevant times, each of the Individual Defendant was the agent of each of the other Individual Defendant and of Lumen and was at all times acting within the course and scope of such agency.

### E. **Reasonable and Prudent Supervision**

60.     To discharge their duties, the officers and directors of Lumen were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Lumen were required to, among other things:

    a.  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

    b.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    c.  properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the company's business and financial prospects and internal controls;

    d.  remain informed as to how Lumen conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make

reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with environmental, federal and state laws;

e.  ensure that Lumen was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

61.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Lumen and its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Lumen, as well as in the use and preservation of its property and assets.

62.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lumen, the absence of good faith on their part, and a reckless disregard for their duties to Lumen and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Lumen.

63.    The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

64.    In addition, as a result of the Individual Defendants' illicit actions and course of conduct, the Company is now the subject of multiple lawsuits that allege violations of federal securities laws and breaches of fiduciary duties, as well as numerous investigations by federal and state regulatory bodies. As a result, Lumen has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### A.  Company Background

65.     Nominal Defendant Lumen is a Louisiana corporation with its principal executive offices located in Monroe, Louisiana. The Company was formerly known as "CenturyLink, Inc." and changed its name to "Lumen Technologies, Inc." in September 2020. Lumen's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LUMN."

66.     Lumen is a telecommunications and technology company that provides various integrated products and services under the Lumen, Quantum Fiber, and CenturyLink brands to businesses and residential customers in the U.S. and internationally. Lumen operates, *inter alia*, a copper cable network for certain of its telecommunications services.

67.     Lumen is a member of USTelecom, a broadband association that represents companies in the industry. Lumen is also one of multiple telecommunications companies that inherited the Bell Telephone Company's (a/k/a "Ma Bell" or the "Bell System") telecom cables in the decades following the breakup of the Bell System's telecommunications monopoly in 1984. Lumen purports to operate one of the world's most interconnected telecom networks.

### B.  Background on Lead Cables

68.     From the late 1800s through the 1950s, telecommunications companies hung, buried, or placed under water extensive networks of cables containing lead sheaths—casing that protects the wires—throughout the United States. As per the Bell Laboratory Record, a publication of the Bell System, the entire cable system in 1957 had used around 100 million pounds of lead in just the prior year alone.

69.     Nearly 150 years have passed since the earliest installations of these lead cables took place, with ownership of the cabling typically changing hands multiple times along the way.

As a result, accurately identifying the amount of lead-clad cabling and its specific installation sites in aerial, underground and underwater scenarios is a monumental challenge.

70.     The U.S. telecom industry began to phase out placement of new lead-clad telecom cables in the 1950s after developing a new type of sheathing to protect the interior copper wires. But lead-clad cables were foundational to the growth of telephone networks, setting the stage for today's communications infrastructure. In many cases, these cables are still in use today to provide vital communications services across the country. However, the lead cables turned porous from exposure to weather elements for decades—hot and cold, snow, rain, sun—which have all led to their deterioration.

71.     The vast existence of the lead cables and their rapid deterioration was exposed by a series of articles published by *WSJ* in July 2023, which reported that there were lead-sheathed cables identified at numerous sites across the country, where legacy cables were releasing lead into the surrounding water and soil at potentially harmful levels. As described in more detail below, the *WSJ* articles detailed how telecom companies have long been aware of lead in the cables and the risks they posed to the health of workers and the public at large. Companies, including Lumen, have previously been fined for harmful lead exposure on workers.

72.     As described below, the Individual Defendants knowingly failed to conduct adequate oversight to ensure that Lumen's operation and maintenance of its telecom network and infrastructures were compliant with federal and state laws and regulations, as well as conforming with environmentally safe and sound practices, as promised to its shareholders in public statements and regulatory filings made by Lumen.

73.     Lumen's inaction for many years has not only harmed the public and the environment, but it also cost the Company vast resources, including time, staffing, and billions of

dollars in locating and replacing the lead sheathing as well as remedying the environmental damage that the cables have caused over time. Instead of proactively identifying and replacing lead cables over time—allowing the Company both to minimize the environmental and health risks they pose while also distributing the costs of replacement over a period of years—Lumen in now faced with compulsory demands that all cables be replaced at once and immediately.

74. Additionally, Lumen has expended—and will continue to expend—large sums of financial resources addressing regulatory probes and investigations and defending litigation arising out of such conduct.

**C.  Ill Effects of Lead on Health and Environment**

75. Lead is one of the most significant environmental pollutants, and several studies have demonstrated that lead is the cause of various health problems. Once lead enters the body, it is distributed to organs such as the brain, kidneys, liver and bones. The body stores lead in the teeth and bones, where it accumulates over time. Such exposure and accumulation of lead may disturb physiological functions and induce numerous adverse effects in the respiratory system, such as Chronic Obstructive Pulmonary Disease (COPD), changes in the lungs, asthma, lung cancer, and nervous system, cardiovascular, digestive and kidney disorders. Research shows that no amount of contact with lead is safe, whether it is ingested or inhaled.

76. Young children, including unborn babies, are at greatest risk of the health effects of lead exposure. This is particularly so for children's physical and mental development, because research has indicated that lead absorption in children is faster than adults. Children are most often exposed to lead by swallowing items or soil containing lead or breathing in dust containing lead, making them particularly susceptible to the risks posed by the lead cables complained of herein. For example, two 6-year-old children showed high levels of lead after tests taken days after playing

in a lot with low hanging cables. Lead exposure can lead to heightened risks of behavioral and learning problems and damage to the central nervous system in children. Such exposure can permanently damage the brain and impair intellectual development.

77.     Lead also causes long-term harm in adults, including increased risk of high blood pressure, cardiovascular problems, and kidney damage. Exposure of pregnant women to high levels of lead can cause miscarriage, stillbirth, premature birth, and low birth weight.

78.     High levels of lead exposure can be serious and life threatening. In children, symptoms of severe lead poisoning include irritability, weight loss, abdominal pain, fatigue, vomiting, and seizures. Adults with lead poisoning can experience high blood pressure, joint and muscle pain, difficulty with memory or concentration, and harm to reproductive health.

79.     Research relating to environmental exposure to lead points to the fact that consistently being exposed to lead causes disorders and inflammation. The lead exposure could cause respiratory, neurologic, digestive, cardiovascular, and urinary diseases. Research also suggests that the increased inflammatory cells and mediators due to lead exposure, including cytokines[1] and chemokines,[2] can be the cause various organ disorders.

80.     At the federal level, lead is recognized as a hazardous substance under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980. In addition to CERCLA, lead is listed as a hazardous waste under the Solid Waste Disposal Act (often referred to as the Resource Conservation and Recovery Act or RCRA).

---

[1] Cytokines are small proteins that are crucial in controlling the growth and activity of other immune system cells and blood cells. When released, they signal the immune system to do its job.
[2] Chemokines control the migration and positioning of immune cells in tissues and are critical for the function of the innate immune system.

81.     Lead is considered a potent environmental toxin with non-biodegradable nature, and its toxic effects are well studied. Research shows ecosystems near point sources of lead demonstrate a wide range of adverse effects including losses in biodiversity, changes in community composition, and decreased growth and reproductive rates in plants and animals. Lead strongly prevents seed germination, seedling development, plant growth, transpiration, chlorophyll production, and water and protein content in plants. Similarly, water polluted with lead is a major environmental threat, leading to elevated lead levels that are detrimental to the health and vitality of human and marine organisms.

### D.  The Individual Defendants' False and Misleading Statements to the Investors

82.     During the relevant time period, on March 11, 2019, Lumen—then still known as CenturyLink—filed an annual report on Form 10-K with the SEC during pre-market hours, reporting the Company's financial and operational results for the quarter and year ended December 31, 2018 (the "2018 10-K").  With respect to Lumen's cable network, the 2018 10-K stated, in relevant part, that "[m]ost of our products and services are provided using our telecommunications network, which consists of [*inter alia*] . . . copper cables" and that, "[a]t December 31, 2018, our network included . . . [a]pproximately 910,000 miles of copper plant," without discussing what, if any, percentage of this copper cable network contained lead.

83.     The 2018 10-K also downplayed Lumen's risks related to environmental matters while simultaneously touting the Company's environmental, safety, and health compliance activities, stating, in relevant part:

> From time to time we **may** incur environmental compliance and remediation expenses, mainly resulting from owning or operating prior industrial sites or operating vehicle fleets or power supplies for our communications equipment. Although we cannot assess with certainty the impact of any future compliance and remediation obligations or provide you with any assurances regarding the ultimate impact thereof, **we do not currently believe that future environmental compliance**

> *and remediation expenditures will have a material adverse effect on our financial condition or results of operations*.
>
> * * *
>
> In connection with our current operations, we use, handle and dispose of various hazardous and non-hazardous substances and wastes. In prior decades, certain of our current or former subsidiaries owned or operated, or are alleged to have owned or operated, former manufacturing businesses, for which we have been notified of certain potential environmental liabilities. ***We monitor our compliance with applicable regulations or commitments governing these current and past activities.*** Although ***we believe that we are in compliance with these regulations in all material respects***, our use, handling and disposal of environmentally sensitive materials, or the prior operations of our predecessors, ***could*** expose us to claims or actions that ***could potentially*** have a material adverse effect on our business, financial condition and operating results.

(Emphases added.)  Plainly, the foregoing risk warnings accompanying these positive statements regarding Lumen's environmental, safety and health compliance activities were generic "catch-all" provisions that were not tailored to the Company's actual known risks regarding its ownership of lead-covered cables, much less the significant public health and environmental pollution risks these cables posed, or the Company's potential liability for damages associated with these cables.

84.     On February 28, 2020, Lumen filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2019 (the "2019 10-K"). With respect to Lumen's cable network, the 2019 10-K stated, in relevant part, that "[m]ost of our products and services are provided using our telecommunications network, which consists of [*inter alia*] . . . copper cables" and that, "[a]t December 31, 2019, our network (both owned and leased) included . . . [a]pproximately 916,000 miles of copper plant;" without discussing what, if any, percentage of this copper cable network contained lead.

85.     The 2019 10-K also contained the same statements as referenced in ¶ 71, *supra*, downplaying Lumen's risks related to environmental matters while simultaneously touting the Company's environmental, safety, and health compliance activities.

86.     In addition, the 2019 10-K discussed Lumen's environmental contingencies, without disclosing the particular nature or cause of those contingencies, stating, in relevant part:

### Environmental Contingencies

In connection with our largely historical operations, we have responded to or been notified of potential environmental liability at approximately 200 properties. We are engaged in addressing or have liquidated environmental liabilities at many of those properties. We could potentially be held liable, jointly, or severally, and without regard to fault, for the costs of investigation and remediation of these sites. The discovery of additional environmental liabilities or changes in existing environmental requirements could have a material adverse effect on our business.

(Emphasis in original.)

87.     On February 25, 2021, Lumen filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K stated that Lumen's "mass-marketed legacy copper-based services [are] managed for optimal cost and efficiency"; that "[o]ur network, through which we provide most of our products and services consists of [*inter alia*] . . . copper cables"; and that, "[a]t December 31, 2020, our network (both owned and leased) included . . . [a]pproximately 916,000 miles of copper plant;" without discussing what, if any, percentage of this copper cable network contained lead.

88.     The 2020 10-K also provided generic, boilerplate representations that continued to downplay Lumen's risks related to environmental matters, stating, in relevant part:

Our networks and properties are subject to numerous federal, state and local regulations, including environmental compliance and remediation expenses . . . . Such regulations *may* also require us to pay substantial fees.
* * *
As a large multinational business with complex operations, we face various other *general* risks, including among others:

- the risk a *perceived* failure to meet evolving environmental, social and governance ("ESG") practices or benchmarks *could* adversely impact our business, brand, stock price or cost of capital; [and]

- the risk a challenge to our ESG statements *could* lead to reputational harm or lawsuits[.]

* * *

From time to time, we are subject to judicial and administrative proceedings brought by various governmental authorities under [environmental protection and health and safety] laws. Several such proceedings are currently pending, *but none is reasonably expected to exceed $300,000 in fines and penalties.*

89.     On April 22, 2021, Lumen issued a press release announcing the publication of its 2020 environmental, social, and governance ("ESG") report (the "2020 ESG Report"). The 2020 ESG Report quoted Defendant Storey, who represented, in relevant part, that Defendants are "deeply involved in activities that protect the health and wellbeing of our people, our customers and our communities . . ."; that "we are mindful that social responsibility and environmental stewardship are inherent in the Lumen purpose and everything we do"; that "[w]e deliver our promise through [inter alia] . . . our respect for the environment and our ongoing involvement in our communities"; and that "Lumen supports environmental sustainability and social wellbeing and . . . implement[s] the governance necessary to ensure we hold ourselves to the highest standards of corporate ethics and responsibility."

90.     With respect to Lumen's occupational health and safety ("OHS") practices, the 2020 ESG Report represented, *inter alia*:

The health and safety of our employees and business partners is a top priority for Lumen. We are committed to providing a workplace free of recognized hazards. Our environment, health and safety (EHS) team oversees our OHS program, focusing on continuous improvement by incorporating "risk-based thinking" into our organizational safety goals, prioritization of health and safety objectives, and safety management systems.

91.     With respect to how Lumen purportedly combatted unsafe and hazardous conditions, the 2020 ESG Report stated, in relevant part:

Our people know to promptly report unsafe or hazardous conditions or suspected violations of the law to management. If an unsafe or hazardous condition is reported, managers provide necessary notices, warnings or controls to prevent exposure to the hazardous condition and report the condition to the company's EHS team and/or our 24/7 incident reporting system. Suspected violations of the company's Code of Conduct or legal obligations are reported to the Integrity Line, the company's compliance hotline.

92.     With respect to Lumen's purported environmental compliance procedures, the 2020

ESG Report stated, *inter alia*:

Our environmental management systems (EMS) help us identify and reduce the environmental impacts of our operations, drive continuous improvement in our results and facilitate regulatory compliance. We consider both internal and external issues, including authority and the ability to control and influence, organizational units, physical boundaries, legal requirements and contractual obligations as we determine the scope of our EMS work. Lumen is committed to complying with applicable environmental regulations.

93.     On February 24, 2022, Lumen filed an annual report on Form 10-K with the SEC,

reporting the Company's financial and operational results for the quarter and year ended December

31, 2021 (the "2021 10-K"). The 2021 10-K stated that Lumen's "mass-marketed legacy copper-based

services[ are] managed for optimal cost and efficiency"; that "[o]ur network, through which we provide

most of our products and services, consists of [*inter alia*] . . . copper cables"; and that, "[a]t December

31, 2021, our Mass Markets broadband-enabled locations consisted of 25.8 million copper-based

passings . . ."; without discussing what, if any, percentage of this copper cable network contained lead

94.     The 2021 10-K also touted Lumen's purported environmental compliance and

sustainability operations, stating, in relevant part:

Environmental stewardship is inherent in our identity. We review the impact of our operations and make choices to reduce our environmental footprint. We believe our commitment to environmental sustainability promotes the financial health of our business, the quality of service we provide and value creation for our employees, communities, customers and investors. Our Environment, Health and Safety ("EHS") team oversees and executes the company's EHS and environmental sustainability visions.

\* \* \*

Environmental compliance and management: The Lumen EHS team assesses and reviews our company programs, operational facilities and waste management vendors. We monitor environmental legislative activity and collaborate with other internal groups to develop documented practices and procedures that support compliance with applicable laws and regulations.

\* \* \*

Waste: We aim to reduce our waste through minimization, re-use and recycling. We divert millions of pounds of electronic and communications equipment from landfills each year. We recycle telecommunications equipment[.]

\* \* \*

Occupational Health and Safety: The EHS team conducts risk assessments and monitors health and safety legislation to develop policies and procedures designed to eliminate or control safety hazards and support compliance with applicable laws and regulations.

95.    On November 4, 2022, Lumen issued a press release announcing the release of its 2021 ESG report (the "2021 ESG Report"). The 2021 ESG Report quoted Defendant Storey, who continued to represent that "[o]ur social responsibility and environmental stewardship are inherent in everything we do[.]"

96.    With respect to Lumen's OHS practices, the 2021 ESG Report represented, *inter alia*:

Providing a safe and healthy working environment for our people, partners and visitors is of paramount importance. We are committed to workplaces that are free of recognized hazards.

**Our approach**

We design our safety management systems to drive continuous improvement in performance by incorporating "risk-based thinking" into our organizational objectives and goals. Our environment, health and safety (EHS), risk management and operations teams continuously monitor safety performance to evaluate opportunities to eliminate or reduce the risks of workplace hazards.

97.    With respect to Lumen's waste reduction practices, the 2021 ESG Report stated, in relevant part:

26

**Recycling and product end-of-life management**

Each year, we divert millions of pounds of electronic and communications equipment away from landfills. We recycle telecommunications equipment and items such as batteries, wood poles, electronics, copper wire, fluorescent lamps, fleet oil and solvents.

98.     With respect to Lumen's purported commitment to protecting the environment, the

2021 ESG Report stated, *inter alia*:

We are committed to environmental stewardship, knowing that sustainability promotes the health of both our planet and our business and creates value for our customers, employees, suppliers, communities and investors . . . . We also regularly assess our impact to find new ways to reduce carbon emissions, eliminate waste and manage water consumption.

* * *

Lumen is committed to incorporating appropriate environmental sustainability principles and practices throughout our operations as we work to serve our customers and our communities.

99.     With respect to Lumen's purported environmental compliance procedures, the 2021

ESG Report stated, *inter alia*:

To determine the scope of our EMS [environmental management system] work, we explore the most material environmental issues inside and outside our business alongside our legal requirements, and we consider where and how we can make an impact. We assess and review our programs, operational facilities and designated suppliers through our EHS team. We also monitor emerging legislation and regulation.

To drive improved performance, we collaborate with teams across our business to develop effective, documented practices and procedures, which we make available to all employees on our intranet.

We broaden our impact by participating in the Environment, Health & Safety Communications Panel (EHSCP) Environment Committee, a forum through which industry professionals share best practices, monitor emerging issues and engage with policy makers.

100.     On February 23, 2023, Lumen filed an annual report on Form 10-K with the SEC,

reporting the Company's financial and operational results for the quarter and year ended December 31,

2022 (the "2022 10-K"). The 2022 10-K stated that Lumen's "mass-marketed legacy copper-based

services[ are] managed for optimal cost and efficiency"; that "[o]ur network, through which we provide most of our products and services, consists of [*inter alia*] . . . copper cables"; and that, "[a]t December 31, 2022, approximately 3.1 million of our Mass Markets broadband-enabled units were capable of receiving services from our fiber-based infrastructure, with the remainder connected with copper-based infrastructure", without discussing what, if any, percentage of this copper cable network contained lead.

101.    The 2022 10-K also continued to tout Lumen's purported environmental compliance and sustainability operations, stating, in relevant part:

> Environmental stewardship is inherent to our mission and identity. We believe our commitment to environmental sustainability promotes the financial health of our business and strengthens our relations with our employees, communities, customers and investors.
>
> In early 2022, we formed the Sustainability Management Committee ("SMC") comprised of employees from across the business. The SMC designs and oversees our company-wide sustainability program . . . and is responsible for driving the sustainability agenda with the Board and senior leadership. Additionally, our Environment, Health and Safety ("EHS") team is responsible for overseeing and implementing our EHS and environmental sustainability initiatives.
>
> * * *
>
> Environmental compliance and management: The Lumen EHS team assesses and reviews our company programs, operational facilities and waste management vendors. We monitor environmental legislative activity and collaborate with other internal groups to develop documented practices and procedures that support compliance with applicable laws and regulations.
>
> * * *
>
> Waste: We are committed to reusing and recycling products, minimizing material use and carefully managing our waste. Each year, we divert millions of pounds of electronic and communications equipment from landfills. We recycle telecommunications equipment[.]
>
> * * *
>
> Occupational Health and Safety: The EHS team conducts risk assessments, reviews safety incident data and monitors health and safety legislation to

develop policies and procedures designed to minimize safety hazards and support compliance with applicable laws and regulations. We carry out periodic reviews to identify steps designed to improve overall safety performance.

102.    The foregoing clearly demonstrates the Individual Defendants' recognition of the need to abide by various environmental, federal, and state and regulations. Lumen's continuous claims of commitment to environment and sustainability program, while hiding its use of lead cables smacks of bad faith.

103.    The Individual Defendants knew or should have known that the foregoing disclosures and filings contained falsehoods and/or material misrepresentations concerning the use of lead-sheathed cables in Lumen's network and operations, and they were under an obligation to cause the Company to make full and fair disclosure concerning (a) the effectiveness of the Company's policies and procedures with respect to environmental pollution, and (b) the scope and impact of widespread use of lead cables in their telecom network.

104.    The Individual Defendants nevertheless permitted or caused the Company to make these false and/or misleading statements to shareholders, in breach of their legal, fiduciary, and ethical obligations under state and federal law and Lumen's own Code of Conduct.  into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

105.    The Individual Defendants further failed to conduct a reasonable inquiry into the Company's operations and/or take corrective action concerning these misrepresentations and the use of lead-sheathed cables in Lumen's network.

106.    Meanwhile, the Individual Defendants continued receiving millions of dollars from the Company in compensation, director remuneration, bonuses and other corporate perks.

**E.  Lumen's False and Misleading Proxy Statements**

107.     Between 2019 and 2023, under the direction and watch of the Individual Defendants Lumen consecutively filed a series of Proxy Statements with the SEC that contained material misrepresentations and failed to disclose that Lumen used and continues to use lead-sheathed cables, in complete disregard to the Company's ESG policies and public health.

**1.     Lumen's 2019 Proxy Statement**

108.     On April 10, 2019, Lumen filed a Proxy Statement with the SEC for the year 2019 ("2019 Proxy Statement"). The 2019 Proxy Statement recommended investors to vote in favor of electing Defendants Bejar, Boulet, Brown, Chilton, Clontz, Glenn, Hanks, Landrieu, Perry, Post, Roberts, Storey and Seigel to the Board of Directors.

109.     The 2019 Proxy Statement stated, "While senior management has primary responsibility for managing risk on a day-to-day basis, our Board is responsible for overseeing our risk management processes. These processes are a coordinated effort among our business units, senior leadership, risk management personnel and internal auditors."

110.     Lumen's 2019 Proxy Statement further stated, under the Corporate Social Responsibility section, "The Board and management team are committed to CenturyLink's vision to make a positive difference in the world and specifically in the communities we serve. This commitment is supported at all levels of our organization, across the globe. Through our actions, our goal is to make our employees, business partners and communities proud of our innovative and quality services, the unwavering integrity of our business ethics, our deep commitment to being a good employer, our respect for the environment, and our ongoing support of the communities where we live and work."

111.     The 2019 Proxy further talks about Lumen's Environmental Sustainability Program, which "requires a thoughtful approach, balancing the needs of our employees, customers,

shareholders and the environment. This balanced approach means ensuring environmental sustainability efforts support the financial health of our business, the quality of service we offer our customers and the value we create for our shareholders and our communities."

112.    The 2019 Proxy Statement was false and misleading because the Board failed to disclose that  (1) Lumen owned and/or still owns thousands of miles of cables wrapped in lead, a known carcinogen, within the U.S.; (2) that the lead cables have harmed and posed the risk of further harming the environment, and exposed Company employees and the general public to this dangerous carcinogen, thereby posing a significant public health risk and environmental pollution risk; (3) Lumen was on notice about the damage and risks presented by these lead-covered cables but failed to provide adequate lead training to employees and did not disclose the cables as a potential threat to everyday people and communities; (4) all the foregoing subjected the Company to a heightened risk of governmental and regulatory oversight and enforcement actions, as well as legal and reputational harm; and (4) as a result, Defendants' positive proclamations in their 2019 Proxy Statement about the Company's commitment to the environment were materially misleading and/or lacked a reasonable basis at all relevant times.

113.    The 2019 Proxy Statement also represented that the Company has strong "clawback" policies in place to prevent improper compensation. The 2019 Proxy Statement states that the "clawback policies and award caps [] provide safeguards against inappropriate behavior," and Lumen's "Our Corporate Governance Guidelines authorize the Board to recover, or "clawback," compensation from an executive officer if the Board determines that any bonus, incentive payment, equity award or other compensation received by the executive was based on any financial or operating result that was impacted by the executive's knowing or intentional fraudulent or illegal conduct." The 2019 Proxy Statement also noted that "[c]ertain provisions of

the Sarbanes-Oxley Act of 2002 would require our CEO and CFO to reimburse us for incentive compensation paid or trading profits earned following the release of financial statements that are subsequently restated due to material noncompliance with SEC reporting requirements caused by misconduct."

114.    All members of Lumen's Board of Directors derive substantial revenue from the Company; control persons and the Company and are indebted to each other. These conflicts of interest have precluded the Board from adequately monitoring the Company's operations and compliance with their ESG policies, and from calling into question the other Individual Defendants' conduct. Specifically, none of the Individual Defendants have sought to enforce the Company's "clawback" policy as described in the above paragraph, despite having good reason to do so based on the conduct described herein.

### 2.    Lumen's 2020 Proxy Statement

115.    On April 8, 2020, the Company filed its Proxy Statement for the year 2020 with the SEC ("2020 Proxy Statement"). The 2020 Proxy Statement recommended that investors vote in favor of electing Defendants Bejar, Boulet, Brown, Chilton, Clontz, Glenn, Jones, Hanks, Roberts, Storey and Seigel to the Board of Directors.

116.    The 2020 Proxy Statement likewise reiterated the Company's commitment to environment, social and governance leadership. But, the 2020 Proxy Statement did not disclose that  (1) Lumen owned and/or still owns thousands of miles of cables wrapped in lead, a known carcinogen, within the U.S.; (2) that the lead cables have harmed and posed the risk of further harming the environment, and further exposed Company employees and the general public to this harmful carcinogen, thereby posing a significant public health risk and environmental pollution risk; (3) Lumen was on notice about the damage and risks presented by these lead-covered cables but failed to provide adequate lead training to employees and did not disclose them as a potential

threat to everyday people and communities; (4) all the foregoing subjected the Company to a heightened risk of governmental and regulatory oversight and enforcement actions, as well as legal and reputational harm; and (4) as a result, Defendants' positive statements in their Proxy Statements about the Company's commitment to the environment were materially misleading and/or lacked a reasonable basis at all relevant times.

117.    The 2020 Proxy Statement also reiterated the Company's "clawback" policy as a mechanism to avoid improper executive compensation.

### 3.    Lumen's 2021 Proxy Statement

118.    The Company filed its Proxy Statement for the year 2021 on April 7, 2021 ("2021 Proxy Statement"). The Company asked the stockholders to vote unanimously to elect Individual Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts and Storey and Siegel to Lumen's Board.

119.    The 2021 Proxy Statement doubled down on Lumen's commitment to the environment and stated, "we launched our first sustainability-linked bond, confirming our longstanding commitment to environmental initiatives." However, the 2021 Proxy Statement was false and misleading at all times because Lumen failed to disclose that it continues to use lead sheathed cables which are poisoning the land and water, posing a significant risk for the public and the environment.

120.    The Company also reiterated in its 2021 Proxy that it maintains a "clawback" policy to prevent improper executive compensation.

### 4.    Lumen's 2022 Proxy Statement

121.    The Company filed its Proxy Statement for the year 2022 on April 8, 2022 ("2022 Proxy Statement") with the SEC. In the 2022 Proxy Statement, the Company urged the

stockholders to vote in favor or electing Individual Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Siegel and Storey to the Board.

122.    The 2022 Proxy Statement stated, "Environmental stewardship is inherent in our Lumen purpose. We actively review the impact of our operations and make choices to reduce our environmental footprint. We believe our commitment to environmental sustainability promotes the financial health of our business, the quality of service we provide and value creation for our employees, communities, customers and investors."

123.    However, the 2022 Proxy Statement was false and misleading because Lumen once again failed to disclose its use of lead cables and the resultant environmental and health impacts and instead continued to tout its commitment to environmental sustainability.

124.    The Company's 2022 Proxy Statement reiterated its "clawback" policy and stated that "Our Corporate Governance Guidelines authorize the Board to recover, or 'clawback,' compensation from an executive officer if the Board determines that any bonus, incentive payment, equity award or other compensation received by the executive was based on any financial or operating result that was impacted by the executive's knowing or intentional fraudulent or illegal conduct."

### 5.    Lumen's 2023 Proxy Statement

125.    The Company filed its 2023 Proxy Statement on April 5, 2023 with the SEC ("2023 Proxy Statement"). The 2023 Proxy Statement sought votes to elect Individual Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Johnson, Jones, Roberts and Siegel to Lumen's Board of Directors.

126.    Once again, the 2023 Proxy Statement reiterated Lumen's commitment to the environment. Specifically, the 2023 Proxy Statement stated, "We commit to environmental stewardship, knowing that sustainability promotes the health of our planet and our business, and

creates value for our customers, employees, communities and investors." It also stated that the Company implemented an OHS (Occupational Health and Safety) Management System to "perform periodic reviews designed to identify and achieve improvements in overall safety and performance."

127.    However, the 2023 Proxy Statement was false and misleading because Lumen failed to disclose its use of lead cables and failure to mitigate the environmental impact, as well as the risk to public health, resulting from those cables.  Specifically, despite its claims to value the health and safety of its workers, Lumen did not disclose that it failed to provide adequate lead training to employees and did not disclose the lead cables as as a potential threat to everyday people and communities

128.    The 2023 Proxy Statement reiterated that the Company maintains a "clawback" policy where "Corporate Governance Guidelines authorize the Board to recover, or 'clawback,' compensation from an executive officer if the Board determines that any bonus, incentive payment, equity award or other compensation received by the executive was based on any financial or operating result that was impacted by the executive's knowing or intentional fraudulent or illegal conduct."

### F.  <u>The Truth Begins to Emerge</u>

129.    On July 9, 2023, *WSJ* published an article reporting that more than 2,000 lead-covered cables previously used by Ma Bell and, subsequently, by various successor telecommunication companies, were degrading and leaching into soil and groundwater, posing a significant public health risk. ("July 9 *WSJ* Article").

130.    The July 9 *WSJ* Article detailed that telecom giants, including Lumen, have "left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a [*WSJ*] investigation found. As the lead degrades, it

is ending up in places where Americans live, work and play." The July 9 *WSJ* Article noted that the lead levels "exceeded safety recommendations set by the U.S. Environmental Protection Agency." According to this report, WSJ's investigation found that more than 1,750 underwater cables are covered with lead. The investigation further found that "analysis of the five most densely populated states, and more than a dozen of the most densely populated counties in the nation, identified about 250 aerial cables alongside streets and fields next to schools and bus stops…" posing significant health issues for the public.

131.    Shortly after, on July 11, 2023, the *WSJ* published another article titled "Lawmakers Demand Telecom Firms Act on Toxic Lead Cables After WSJ Investigation" reporting "[l]awmakers are demanding that telecom firms act to ensure that Americans are safe after [the *WSJ's*] investigation revealed that phone companies have left behind a network of cables covered in toxic lead, tainting water and soil in some locations." The article also cited legislators' and regulators' intentions to scrutinize lead cables owned by USTelecom members and to hold those members accountable. Many senators sprang into action and demanded answers.

132.    For example, the very next day, on July 12, 2023 Senator Markey, chair of the Senate Environment and Public Works Subcommittee on Clean Air, Climate and Nuclear Safety sent a letter to the USTelecom demanding answers and action to the lead exposure by the telecom companies. Among other things, Senator Markey asked the telecom companies how they intend to locate the lead covered wires, how they plan to address the environment and health issues posed by such cables, and if the companies will commit to testing for soil, water and other contamination caused by such cables and to remediating any contamination found. Senator Markey called on the telecom companies to "act swiftly and responsibly to ensure the mitigation of any environmental and public health effects." Another senator noted that "[t]here is no safe level of lead exposure . .

. [i]t is imperative that these cables be properly scrutinized and addressed." The telecom companies were given until July 25, 2023 to respond to Senator Markey's questions.

133.    The same day, on July 12, 2023, *WSJ* published another article entitled "What AT&T and Verizon Knew About Toxic Lead Cables" which detailed the role of telecom companies, including Lumen, in spreading lead pollution. This article noted that the telecom companies have known for decades that the "lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment." The article noted that despite this knowledge, the companies "haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead." The *WSJ* investigation found that, out of 200 environmental samples collected from about 130 sites, roughly 80% of sediment samples showed elevated levels of lead. The investigation also noted that "[l]ike asbestos, lead must either be sealed away or removed completely to eliminate the risks."

134.    The July 12 *WSJ* article featured an account from a Lumen worker who was impacted by the elevated lead exposure. The Lumen worker had alerted the Communications Workers of America Union ("CWA Union") that he was feeling "intensely fatigued" after working in manholes, which triggered a 2013 Minnesota OSHA investigation leading to nine "serious" lead-related citations for Lumen. Specifically, the Minnesota OSHA issued nine citations for violations of OSHA Lead Standards, called Lumen's lead training "inadequate," and found a Lumen worker "handling lead was exposed to airborne lead averaging 76 micrograms per cubic meter of air over eight hours, 52% above the regulator's limit." In November, 2013, Lumen settled with the Minnesota OSHA, which required Lumen to enter into a lead abatement program. The

lead abatement program required Lumen to include notification and training; coverage of safe and healthful work practices and procedures; provision of appropriate engineering, administrative, and personal protective equipment to prevent/control lead exposure; medical surveillance; and personal hygiene.

135.    Also on July 14, 2023, during post-market hours, the *WSJ* published yet another article entitled "AT&T, Other Telecom Stocks Sink After WSJ Investigation on Toxic Lead Cables" citing various analyst and market concerns related to, *inter alia*, Lumen's exposure to enormous liabilities related to its lead-sheathed cables. In particular, the article noted that, after AT&T Inc. ("AT&T"), Verizon Communications Inc. ("Verizon") and Lumen would have the most lead-covered cables to remove. A JPMorgan analyst noted that "[p]otential copper lead sheathing liability is unquantifiable at this time but will be a substantial long-term overhang on AT&T and the industry." Another analyst from New Street Research estimated that removing the lead-cased copper wires across the country "could cost as much as 59 billion." Analysts at Citigroup noted that "stocks with exposure to wirelines networks could trade lower in the near-term because of uncertainty and risk related to the lead-cable concerns." This article noted that Lumen's stock had dropped "more than 15% [within the] week" since *WSJ* first published the exposé.

136.    The same day, in a separate report, *WSJ* published accounts of workers at AT&T that were exposed to lead on the job. This article highlighted the risks posed by lead exposure to telecom workers and reiterated that "no amount of lead is safe," noting that workers have reported "neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure." According to one account, a worker who worked for six years melting lead, while wearing fingerless gloves and no mask, and slicing lead cables once

a week had to have her kidney removed after a resurgence of cancer, further highlighting the risks associated with lead, which is classified as a probable carcinogen. In another worker account, after working with lead solder for 40 years, the worker said "she couldn't get pregnant and had anemia. Severe anxiety and brain fog, plus kidney-related ailments all the time."

137.    Then, on July 17, 2023, *WSJ* published another article titled "Environmental Groups Ask EPA to Shield Public from Abandoned Lead Cables" which detailed that three environmental groups—the Environmental Defense Fund ("EDF"), Clean Water Action and Below the Blue—have asked the EPA to ensure "immediate removal" of all abandoned lead cables hung on poles accessible to children from the ground, as well as to assess the risks of underwater cables.

138.    The Environmental Defense Fund, in a letter to the EPA on July 17, 2023, called upon the agency to "prioritize the immediate removal of lead-sheathed cables accessible to children or strung overhead between telephone poles." The letter noted that "[lead] cables pose the greatest exposure risk to lead, and they can be easily fixed. For the underwater cables, EPA should assess the risk, prioritizing those in sources of water protected for drinking." The EDF had also accompanied *WSJ* reporters on site visits to collect samples, locate lead cables, and aid the *WSJ* by providing guidance and technical assistance.

139.    Lynn Thorp, National Campaign Director at Clean Water Action, also reviewed the *WSJ*'s findings and joined EDF's call for EPA action. In a statement Thorp said, "[w]ith communities nationwide grappling with the legacy of lead service lines in drinking water systems, it's imperative that EPA act expeditiously to address these uncontrolled risks to drinking water sources and to prevent unnecessary additional lead exposures from any source."

140.    Similarly, Below the Blue, a community-based organization, brought to light the existence of lead cables in Lake Tahoe and joined EDF's letter calling EPA to act expeditiously on its remediation.

141.    On July 20, 2023, Congressman Pat Ryan also wrote to the CEOs of various telecom companies, as well as the USTelecom, and urged that they remove toxic lead cables. Ryan expressed his concern over the lead-sheathed copper wiring across America and called out the telecom companies, calling the hidden lead cables the "latest failure" by telecom companies. Ryan also demanded answers to the same questions posed by Senator Markey. In his letter, Ryan also noted that the fact that companies knew about the lead-covered cables "left abandoned in communities and did not proactively work to mitigate the impacts of the cables" was unacceptable.

142.    More recently, Ryan has renewed his calls for quick action by telecom companies in removing these cables. On March 16, 2024, Ryan met with members of the Cornwall Cleanup Crew to visit dumping sites where they found lead coated wire, which had been oxidized and resulted in toxins leaching into the soil. In a press conference on the same day, Ryan publicly stated that it was the responsibility of telecom companies to disclose the locations of such cables and clean them up, while noting that it should be the telecom companies "foot[ing] the bill" and not taxpayer money. The same day, on July 20, 2023, New York's Governor, Kathy Hochul also directed the state agencies to investigate old lead covered cables left in the communities. Specifically, Gov. Hochul directed the Department of Public Service, Department of Health and Department of Environmental Conversation to "immediately investigate a recent report of old lead-covered cables left by telecommunication companies and the potential public health risks associated with exposure to those cables."

143.    On Gov. Hochul's direction, the New York State Department of Environmental Conservation sent a letter to 246 facilities-based telecommunication providers, which included Lumen, to "begin compiling an inventory of the presence of aerial and buried cables, both on land and below water, containing lead across New York."

144.    On July 26, 2023, the *WSJ* published another report, titled "Justice Department and EPA Probe Telecom Companies Over Lead Cables" reporting that both DOJ and EPA are investigating the potential health and environmental risks arising out of the sprawling network of lead-sheathed telecom cables scattered all over the US.

145.    The article reported that the "Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with the inquiry."

146.    The EPA, on the other hand, through its "Superfund" law, directed telecom companies such as AT&T and Verizon "to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure" within ten days of the July 26 *WSJ* article. The article further noted that EPA takes "the issues raised in [the *WSJ*] articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution."

147.    On August 1, 2023, on a quarterly earnings call, Lumen's executive management addressed the scandalous *WSJ* articles reporting on the Company's exposure to liability related to lead-sheathed cables. Defendant Stansbury, in his opening remarks disclosed that, by Lumen's own estimation, "5% of [] approximately 700,000-mile copper network contained lead, of which

[Lumen] believe the majority is buried in conduit-based infrastructure." This roughly translates into 35,000 miles of Lumen's "copper" network. In the same earnings call, in a response to an analyst's inquiry regarding whether Defendants "had any discussions around remediation" for the lead-sheathed cable issue, Defendant Stansbury noted that Lumen had spent "a lot of time just determining how much lead" was in the Company's telecom system and could not estimate potential remediation costs.

148.    In November, 2023, Arizona's Attorney General Kris Mayes also announced that she has begun an investigation into lead-covered cables that may be present throughout Arizona. As part of the investigation, Attorney General Mayes sent letters to 200 telecommunications operations, including Lumen, requesting information on the lead-covered cables each company owns. The letter specifically sought information on the type of cable, the location of each such cable (*i.e.* whether it was aerial, underground or underwater), the address or GPS coordinates of such cables, the length of the cables, and any other information that could be used to physically locate such cables. The letter directed companies to respond to this letter within 30 days.

149.    Most recently, on February 6, 2024, *WSJ* reported that the National Institute for Occupational Safety and Health ("NIOSH") is investigating worker safety around lead-sheathed telecom cables, resulting from a "health hazard evaluation in Western Massachusetts after receiving a union request." NIOSH's health hazard evaluations focus on determining exposure to hazardous materials and related health risks. While the agency does not have authority to issue fines or citations, it can share its final report with federal OSHA, which has enforcement authority.

### G.  **Company's Shares Tank as a Result of WSJ Exposé**

150.     The Company's shares steadily declined with each *WSJ* article. On July 9, 2023, when *WSJ* published its first article exposing the harm that the lead cables is causing, Lumen's stock price fell $0.13 per share, or 5.94%, to close at $2.06 per share on July 10, 2023.

151.     On July 11, 2023, the WSJ published an article entitled "What AT&T and Verizon Knew About Toxic Lead Cables," which caused Lumen's stock price to fall $0.03 per share, or 1.45%, to close at $2.04 per share on July 12, 2023.

152.     Subsequently, on July 14, 2023, during intraday trading hours, *Seeking Alpha* reported that a J.P. Morgan analyst had concluded that "Lumen . . . likely . . . ha[s] 'exposure' to potential copper [cable] lead sheathing liability. This news caused Lumen's stock price to fall $0.21 per share, or 10.19%, to close at $1.85 per share on July 14, 2023.

153.     Also on July 14, 2023, during post-market hours, the *WSJ* published an article entitled "AT&T, Other Telecom Stocks Sink After WSJ Investigation on Toxic Lead Cables." Lumen's stock price tanked $0.15 per share, or 8.11%, to close at $1.70 per share the next trading day on July 17, 2023.

154.     As a result of Individual Defendants wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lumen's investors have suffered significant losses and damages.

### DAMAGE TO THE COMPANY RESULTING FROM INDIVIDUAL DEFENDANTS' INACTION

155.     As a direct and proximate result of the Individual Defendants' misconduct, Lumen failed to maintain proper internal controls, consciously disregarded multiple red flags alerting the Individual Defendants to multiple areas of non-compliance with environmental federal state, and

international laws, rules and regulations and caused the Company to release false and misleading statements, substantially damaging the Company's credibility, corporate image and goodwill.

156.    Lumen has expended and will continue to expend significant sums of money as a result. Additional expenditures and damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duties include, but are not limited to:

    a.  Costs incurred in investigating, defending and paying of any settlement or judgment in the securities class action, including, but not limited to the *McLemore v. Lumen Technologies Inc. et al.*, No. 3:23-cv-01290 (W.D.La.), filed for the above misconduct;

    b.  Costs incurred from multiple regulatory investigations including the DOJ and the EPA;

    c.  Costs incurred from the loss of customers' confidence in the Company's services, resulting in lost sales; and

    d.  Following reports in the *WSJ*, Lumen has already suffered a decline in its stock value as well as reputational loss. Lumen's shares have declined steeply, almost shedding 10% of their value in a single day, losing about $210 million of its market cap.

## DERIVATIVE AND DEMAND ALLEGATIONS

157.    Plaintiff brings this action derivatively in the right and for the benefit of Lumen to redress injuries suffered, and to be suffered, by Lumen as a direct result of breaches of fiduciary duty and unjust enrichment.

158.    Plaintiff has standing to bring this derivative action pursuant to La. R.S. 12:1-741, as Plaintiff is a shareholder of Lumen, was a shareholder of Lumen at the time of the wrongdoing alleged herein and has been a shareholder of Lumen continuously since that time.

159.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

160.    Lumen is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

161.    The wrongful acts complained of herein have subjected, and will continue to subject, Lumen to continuing harm because the adverse consequences of the actions are still in effect and ongoing. The wrongful acts complained of herein were unlawfully concealed from Lumen's shareholders.

162.    Throughout the Relevant Period, the Individual Defendants failed to make full and fair disclosure about the effectiveness of Lumen's internal controls and violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties.

163.    Plaintiff made a litigation demand on Lumen dated October 27, 2023 pursuant to La. R.S. § 12:1-742 ("Litigation Demand"). A true and correct copy of the Litigation Demand is attached as **Exhibit A**. The Litigation Demand summarized the misconduct complained of in the present complaint. Plaintiff demanded that the Individual Defendants (i) undertake (or cause to be undertaken) an independent internal investigation into violations of Louisiana, and/or federal law, and/or other state laws; (ii) commence a civil action against each Individual Defendant to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein; (iii) seek recovery of costs incurred from investigating, defending and paying any settlements or judgments pursuant to multiple investigations over the Company's misconduct; (iv) seek recovery of costs incurred from investigating, defending and paying any settlements or judgments in the class action for violations of federal securities laws; and (v) seek millions of dollars in the form of compensation and benefits

the Company paid to the Individual Defendants, who have breached their duties to Lumen. Ex. A at 6.

164.    Pursuant to La. Stat. Ann. § 12:1-742, the Individual Defendants were afforded a period of 90 (ninety) days to respond to the Litigation Demand. The 90-day period expired on January 26, 2024. Upon the expiration of the 90-days (or at any point afterwards), Individual Defendants have not responded to the Litigation Demand. By way of courtesy, Plaintiff sent a follow up letter on February 16, 2024 (the "Follow Up Demand Letter"), seeking a response as to how Lumen intends to comply with Plaintiff's demand or if the demand had been rejected. Individual Defendants did not respond to the Follow Up Demand Letter either. A true and correct copy of the Litigation Demand Follow Up Demand Letter is attached as **Exhibit B.** Individual Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute an action on behalf of the Company. The wrongful acts complained of herein show multiple breaches by the Individual Defendants, including the breaches of their fiduciary duties of loyalty, due care and oversight.

165.    The majority of the Board is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action. The Individual Defendants' conduct described herein and summarized above demonstrates a pattern of misconduct that could not have been the product of legitimate business judgment as it was based on intentional, reckless, and disloyal misconduct. Thus, none of the Individual Defendants, who constitute a majority of the current Board of the Company, can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Individual Defendants face a substantial likelihood of liability in connection with their own self-interested dealing on behalf of the Company, they cannot be presumed to be capable

of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.

166.     Based on the foregoing, the Individual Defendants face a sufficiently substantial likelihood of liability and accordingly, there is a reasonable doubt as to each Defendant's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest. Accordingly, any other demand upon the Individual Defendants is futile.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I**</u>

**(Against Individual Defendants for Breach of Fiduciary Duties)**

167.     Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

168.     The Individual Defendants owed and owe Lumen and its shareholders fiduciary obligations, including the obligations of good faith, fair dealing, loyalty and care. Among other things, the Individual Defendants owed a fiduciary duty to Lumen to disseminate truthful, accurate and complete information to shareholders.

169.     The Individual Defendants breached their duties of loyalty, care and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with Company procedures and environmental, federal, state, and international laws, rules, and regulations; and (iii) consciously disregarding and failing to ensure that Lumen's public statements were proper and accurate.

170.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts even though such facts were readily available to them. Such material misrepresentations and omissions were committed knowingly or recklessly.

171.    The Individual Defendants had actual or constructive knowledge that the Company was engaging in the practices as set forth herein, and that internal controls were not adequately maintained.

172.    As a direct and proximate result of the breaches of fiduciary obligations by the Individual Defendants, Lumen has been exposed to various federal and state investigations and securities class actions and has sustained and continues to sustain significant damages, as alleged herein. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173.    By reason of the foregoing, Lumen was and continues to be damaged.

## COUNT II

### (Against Individual Defendants for Unjust Enrichment)

174.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

175.    Through the wrongful course of conduct and actions complained of herein, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lumen. The wrongful conduct was continuous and resulted in ongoing harm to the Company. The Individual Defendants were unjustly enriched pursuant to receiving generous compensation and director remuneration, bonuses and other corporate perks for their service on the Board and as officers of Lumen while the wrongful conduct was ongoing.

176.     Plaintiff, as a shareholder of Lumen, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful course of conduct and fiduciary breaches.

177.     By reason of the foregoing, Lumen was and continues to be damaged.

## COUNT III

**(Derivatively Against the Individual Defendants for Gross Mismanagement)**

178.     Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

179.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lumen in a manner consistent with the operations of a publicly held corporation.

180.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lumen has and will sustain significant damages, liability and loss of goodwill.

181.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## COUNT IV

**(Derivatively Against the Individual Defendants for Waste of Corporate Assets)**

182.     Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

183.    As a result of the foregoing misconduct, the Individual Defendants have caused Lumen to waste valuable corporate assets.

184.    As a result of the foregoing misconduct, the Individual Defendants received and continues to receive generous compensation, which is liable to be clawed back pursuant to the Company's "clawback" policy.

185.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lumen has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to Lumen.

## COUNT V

### (Derivatively Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act)

186.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

187.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

188.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

189.    Under the direction and watch of the Individual Defendants, at the very least, the following Proxy Statements failed to disclose that Lumen continues to use lead-sheathed cables, in complete disregard to the Company's ESG policies and public health: Proxy Statement for the year 2019, dated April 10, 2019; Proxy Statement for the year 2020, dated April 8, 2020; Proxy Statement for the year 2021, dated April 7, 2021; Proxy Statement for the year 2022, dated April 8, 2022; and Proxy Statement for the year 2023, dated April 5, 2023 (collectively, the "Proxy Statements"),. For example, Lumen continued to reiterate its commitment to environment; in their 2022 Proxy Statement, Lumen stated, "Environmental stewardship is inherent in our Lumen purpose. We actively review the impact of our operations and make choices to reduce our environmental footprint. We believe our commitment to environmental sustainability promotes the financial health of our business, the quality of service we provide and value creation for our employees, communities, customers and investors. Our EHS [Environmental, Health and Safety] team oversees and executes the company's EHS and environmental sustainability visions, which are available to all employees on the Lumen intranet." However, the 2022 Proxy Statement failed to disclose that Lumen's use of lead cables is extremely harmful to the environment as well as public health, making these disclosures false and misleading.

190.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions, including but not limited to, misrepresentations and omissions concerning facts that

might necessitate changes to the Company's ESG policies, were material to the Company's shareholders.

191.    Under the direction and watch of the Individual Defendants, the Proxy Statement failed to disclose that (1) Lumen owned and/or still owns thousands of miles of cables wrapped in lead, a known carcinogen, within the U.S.; (2) that the lead cables have harmed and pose the risk of further harming the environment; (3) that the exposure of Company employees and the general public to the lead cables have harmed those exposed and posed significant public health risks; (4) that the lead cables continue to pose significant future public health and environmental pollution risks; (5) Lumen was on notice about the damage and risks presented by these lead-covered cables but failed to disclose them as a potential threat to everyday people and communities, as well as failed to provide adequate lead training to employees; (6) all the foregoing subjected the Company to a heightened risk of governmental and regulatory oversight and enforcement action, as well as legal and reputational harm; and (7) as a result, Defendants' positive statements in their Proxy Statements about the Company's commitment to the environment were materially misleading and/or lacked a reasonable basis at all relevant times.

192.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The 2022 Proxy Statement, for example, contained stockholder proposals urging the stockholders to vote on executive compensation and election of directors, and recommended the stockholders to unanimously vote in favor of these proposals.

193.    The false and misleading Proxy Statements led to, among other things, shareholders approving generous compensation of the Individual Defendants as well as electing them to

Lumen's Board of Directors, allowing them to continue breaching their fiduciary duties to the Company.

194.    Under the direction and watch of Individual Defendants, the Proxy Statements failed to disclose that: (1) contrary to the Proxy Statement's descriptions of the Board's and its ESG policies, the Corporate Governance committees were not adequately exercising these functions and were causing or permitting the Company to continue using toxic lead cables and issuing false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers, or without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2020 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholders and were thus improperly interested in receiving unjust compensation since at least 2019, not merely seeking to obtain and retain the services of qualified individuals for the benefit of the Company.

195.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements. Plaintiff, on behalf of Lumen, thereby seeks relief for damages inflicted upon the Company in connection with the improper approvals of the shareholder proposals.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following:

A.  Determining that this action is a proper derivative action maintainable under the law and demand was made and was futile;

B.  Directing Individual Defendants to account to Lumen for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

C.  Directing Lumen to take all necessary actions to reform its corporate governance and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein;

D.  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.  Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial.


Date: June 11, 2024                          Respectfully submitted,

                                             *s/Radhika Gupta*
                                             **LOWEY DANNENBERG, P.C.**
                                             Andrea Farah (*pro hac vice forthcoming*)
                                             Radhika Gupta (*pro hac vice forthcoming*)
                                             44 South Broadway, Suite 1100
                                             White Plains, NY 10601
                                             Telephone: (914) 997-0500
                                             Fax: (914) 997-0035
                                             afarah@lowey.com
                                             rgupta@lowey.com

                                             *Attorneys for the Plaintiff*


                                             *s/Alex S. Aughtry*
                                             **KATIE LASKY LAW, LLC**
                                             Alex S. Aughtry (LA Bar No. 37019)
                                             Katie E. Lasky (LA Bar No. 28652)
                                             619 Homedale St.
                                             New Orleans, LA 70124
                                             Telephone: (504) 584-7336
                                             Fax: (504) 375-2221
                                             alex@katielaskylaw.com
                                             katie@katielaskylaw.com

                                             *Local Counsel for the Plaintiff*